UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

THINK OPERATIONS, LLC,

        Plaintiff,

v.

TOP SHELF BARBER SUPPLIES, LLC, et al.,

        Defendants.
_____/

Case No. 1:19-cv-752

Honorable Hala Y. Jarbou

## OPINION

This is a diversity action asserting claims for trademark infringement, as well as breach of contract and fraudulent inducement under Michigan law. Plaintiff Think Operations, LLC is a provider of consumer products, including baby products and sports products. It sues Top Shelf Barber Supplies, LLC, and Top Shelf's President, Douglas Mrdeza. Top Shelf is a marketer and seller of products over the Internet. Think hired Top Shelf to market and sell Think's products on Amazon.com. Think claims that it shipped some of its products to Top Shelf but Top Shelf has not paid for those products as required by the agreement between them. Before the Court is Defendants' motion to dismiss part of the complaint for failure to state a claim. (ECF No. 19.) The Court will grant the motion in part.

### I. Background

According to the complaint, in March 2019, Think and Top Shelf entered into an "Amended and Restated Exclusive Distribution Agreement" ("Distribution Agreement"). (Am. Compl. ¶ 26, ECF No. 16.) The Distribution Agreement provided that Top Shelf would be the "sole and *exclusive* distributor for all of [Think's] current and future products . . . on any Sales Channels owned, operated, or offered by Amazon.com, Inc. . . . ." (Distribution Agreement ¶ 4,

ECF No. 16-1.) It also stated that Think would provide Top Shelf the specific products identified in a purchase order attached to the agreement, and that Top Shelf could order additional products on credit. Think agreed to accept orders up to $750,000 on credit, with the first $325,000 subject to repayment "on net 60 day terms," the next $175,000 subject to repayment "on net 30 day terms," and an additional $250,000 subject to repayment "on net 30 day terms." (*Id.* ¶ 13(a).)

Think alleges that, in May 2019, Top Shelf asked to exceed the credit limit in the Distribution Agreement. Think agreed to do so. From May 21, 2019, to July 10, 2019, Top Shelf ordered a total of over $1.6 million in product, and Think agreed to fill these orders, exceeding the credit limit set forth in the agreement.

Think contends that it agreed to do so, in part, because Top Shelf stated on June 11, 2019, that it was "experiencing a slowdown in sales"; Top Shelf "expressed concern" that it was "carrying too much inventory." (Am. Compl. ¶ 32.) Top Shelf allegedly blamed the slowdown on Amazon. The next day, however, Top Shelf ordered almost $370,000 worth of additional products.

In response to Top Shelf's overstocking concerns, Think allegedly contacted Mrdeza and offered to pull back some of its products. However, Mrdeza allegedly told Think that the June 12 Order "was for categories of Think product unaffected by his inventory concerns and complaints against Amazon." (*Id.* ¶ 35.) He also represented that "his analysis of product demand based on 30-day data justified the Top Shelf June 12 Order." (*Id.*) Several months later, however, Top Shelf allegedly admitted that the June 12 Order "did in fact fall within the scope of Top Shelf's inventory overstocking concerns." (*Id.* ¶ 37.)

In the weeks after the June 12 order, Top Shelf continued to purchase more Think product in excess of the original $750,000 credit limit.

By July, Think had provided over $1.6 million worth of product for which it had not received payment. It contacted Top Shelf, which informed Think that Top Shelf would not be able to meet the payment deadlines in the Distribution Agreement.

On July 31, Mrdeza allegedly "made representations [to Think] regarding Top Shelf's present financial wherewithal." (*Id.* ¶ 41.) When proposing new payment dates, Mrdeza allegedly told Think that a proposed date "'*is* the worst case pay date . . . .'" (*Id.*) Mrdeza also told Top Shelf that "he had a line of credit for which he was merely awaiting funding," stating, "'I believe the LOC will allow for quicker payment once the bank makes the funds available.'" (*Id.*) Later, Think learned that Top Shelf did not have an existing line of credit; rather, it had applied for debt financing from Amazon.

Four days after agreeing to a new payment schedule, Mrdeza allegedly informed Think that he meant the first payment date of August 9, 2019, to be August 13, 2019 because "that 'will be the next payment we get from Amazon.'" (*Id.* ¶ 47.) Think agreed to this change. Later, Think learned that the "payment" expected from Amazon was not payment for sales of products; rather, it was merely the hope of receiving Amazon's approval of Top Shelf's application for financing.

When the August 13 deadline arrived, Top Shelf allegedly paid only a "fraction" of the $175,000 that was due. And on August 16, Top Shelf allegedly asked Think to work out a "'more realistic repayment schedule'" or to make other arrangements for Top Shelf to compensate Think. (*Id.* ¶ 52.)

Think attempted mediation as contemplated by the Distribution Agreement, but Top Shelf failed to pay for $1 million in products. Consequently, Think terminated the agreement on September 5, 2019, due to Top Shelf's alleged breach. Think contends that Top Shelf has continued to sell Think's products, but at a price below the one that the parties agreed upon.

Defendants' motion to dismiss concerns Counts 1 and 2 of the amended complaint. In Count 1, Think claims Top Shelf breached the Distribution Agreement. Think also claims that Mrdeza is personally liable for the breach because Top Shelf is a "mere instrumentality" of Mrdeza. (*Id.* ¶ 85.)

In Count 2, Think claims that Top Shelf and Mrdeza fraudulently induced Think to modify the credit limit and the payment deadlines in the Distribution Agreement, and that Think suffered injury beyond what it otherwise would have because Defendants' alleged misrepresentations caused Think to ship more product and to delay termination of the Agreement.

## II. Standard

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under

Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F. 3d 623, 640 (6th Cir. 2016).

### III. Discussion

#### A. Fraudulent Inducement

Think contends that Mrdeza and Top Shelf fraudulently induced it to increase the credit limits and to extend the payment deadlines in the Distribution Agreement. "Fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 534 N.W.2d 217, 219 (Mich. Ct. App. 1995).

There are two categories of representations at issue. First, Think alleges that Top shelf "materially and falsely represented that the Top Shelf June 12 Order was for categories of Think product unaffected by his inventory concerns and complaints against Amazon." (Am. Compl. ¶ 90.) Think contends that it relied on this representation "by agreeing on multiple occasions to permit . . . Top Shelf to exceed the Distribution Agreement's quantity limits." (*Id.*)

Second, Think alleges that Top Shelf "materially and falsely represented Top Shelf's then-existing financial wherewithal, including specifically stating that the dates set forth in the Revised Payment Schedule were the 'worst case' dates and representing that Top Shelf had a line of credit for which it was awaiting funding." (*Id.* ¶ 91.) These representations allegedly induced Think to extend the payment deadlines in the Distribution Agreement. (*Id.*)

5

**1. The economic loss doctrine bars Think's claims**

Think's claims of fraudulent inducement are barred by the "economic loss doctrine," which provides that, "[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic' losses." *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 543 (Mich. Ct. App. 1995).

> This doctrine hinges on a distinction drawn between transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts.

*Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 615 (Mich. 1992). One rationale for the doctrine is that it "'encourages parties to negotiate economic risks through warranty provisions and price.'" *Huron Tool*, 532 N.W.2d at 545 (quoting *Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 512 So.2d 899, 901 (Fla. 1987)). Importantly, "the economic loss doctrine does *not* apply where there is *no* contractual relationship between the parties—that is, where the parties have never been in a position to negotiate the economic risks themselves." *Id.* (emphasis added).

Although the economic loss rule initially developed in circumstances where the *seller's defective product* frustrated the buyer's expectations, the rule also applies where, as here, the *buyer's performance* frustrates the seller's expectations. *See Dinsmore Instrument Co. v. Bombardier, Inc.*, 199 F.3d 318, 320 (6th Cir. 1999) ("[T]he rationale of the Michigan Supreme Court when it adopted the economic loss doctrine applies regardless of whether the buyer or the seller is the plaintiff[.]"). The general principal applicable in both situations is that, where contract law "already address[es] the plaintiffs' concerns . . . the plaintiffs [cannot] pursue an independent tort claim. Any other holding . . . would render the UCC meaningless and 'contract law would drown in a sea of tort.'" *Huron Tool*, 532 N.W.2d at 544 (quoting *Neibarger*, 486 N.W.2d at 618

6

(internal quotation marks omitted)). Put another way, "the essence of the 'economic loss' rule is that contract law and tort law are separate and distinct, and the courts should maintain that separation in the allowable remedies." *Id.* (quoting *Williams Elec. Co. v. Honeywell, Inc.*, 772 F. Supp. 1225 1237-38 (N.D. Fla. 1991)). Thus, a plaintiff generally cannot "maintain an action in tort for nonperformance of a contract." *Farrett v. Gen. Motors Corp.*, 475 N.W.2d 243, 247 (Mich. 1991).

There is an exception to the economic loss doctrine for claims of fraud in the inducement, but that exception does not apply here.

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods.

*Huron Tool*, 532 N.W.2d at 545.

The Court must be careful to distinguish between fraud in the inducement and "other kinds of fraud" that involve "misrepresentations relat[ing] to the breaching party's performance of the contract." *Id.* The latter does not give rise to an independent cause of action in tort because it is "not extraneous to the contractual dispute among the parties, but is instead but another thread in the fabric of [the] plaintiff['s] contract claim. . . ." *Id.* (quoting *Pub. Serv. Enter. Grp., Inc. v. Philadelphia Elec. Co.*, 722 F. Supp. 184, 201 (D.N.J. 1989)). "[T]he threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 658 (Mich. 1997). Fraud that falls within the economic loss rule is often "undergirded by factual allegations identical to those supporting [the] breach of contract counts[.]" *Huron Tool*, 532 N.W.2d at 545 (quoting *Pub. Serv. Enter. Grp.*, 722 F. Supp. at 201). It is not fraud that "induce[d] the plaintiff[] to enter into the

7

original agreement . . . [or] to enter into additional undertakings." *Id.* And it does not "cause harm to the plaintiffs distinct from those caused by the breach of contract[.]" *Id.*

The Court disagrees with Top Shelf's contention that "subsequent agreements that arise under the original contract between the parties . . . cannot be considered fraudulently induced." (*See* Def.'s Reply in Supp. of Mot. to Dismiss 9, ECF No. 24.) The case that Top Shelf cites for this rule, *H&H Wholesale Servs., Inc. v. Kamstra Int'l, BV*, 373 F. Supp. 3d 826 (E.D. Mich. 2019), makes no such statement or holding. Moreover, fraudulently inducing another to *amend* or *modify* the terms of a contract is arguably equivalent to inducing another to enter the contract itself. *See Cord LLC v. RPF Oil Co.*, No. 304894, 2012 WL 3023197, at *2 (Mich. Ct. App. July 24, 2012) (examining claim that defendant fraudulently induced the plaintiff to agree to terminate an existing lease agreement); *cf. United States v. Bae Sys. Tactical Vehicle Sys., LP*, No. 15-12225, 2016 WL 894567, at *4 (E.D. Mich. Mar. 9, 2016) ("The fraudulent inducement theory may apply not only when fraud is used to obtain a contract, but also when used to obtain sub-contracts or modifications to contracts.") (describing a theory of fraud under the False Claims Act). And because fraudulently inducing another to amend a contract is similar to inducing another to enter an original agreement, it is possible that a claim alleging fraudulent inducement in the amendment of a contract would also be exempt from the economic loss doctrine. Indeed, the Michigan Court of Appeals suggested as much when indicating that fraud which induces a party to "enter into the original agreement" or to "*enter into additional undertakings*," might be types of fraud that are extraneous to a contractual dispute and are, thus, not subject to the economic loss rule. *Huron Tool*, 532 N.W.2d at 545 (emphasis added).

Nevertheless, the economic loss doctrine applies here because Think's claims arise from fraud interwoven with Top Shelf's contractual obligations. As such, they are not "extraneous to

8

the contractual dispute." *Dinsmore Instrument Co.*, 199 F.3d at 320.  Think alleges that Top Shelf misrepresented its concerns about product sales and its ability to pay in accordance with the Distribution Agreement, inducing Think to modify the payment obligations and credit limit in the agreement.  These alleged misrepresentations directly relate to Top Shelf's performance under the contract.  In addition, Think's claimed harm for the fraudulent inducement closely parallels that for its breach of contract claim.  Both claims allege harm arising from Top Shelf's failure to pay for product as required by the Distribution Agreement.[1]  Thus, the two claims are interwoven with one another.

Furthermore, the economic loss rule applies because Think could have protected itself through its contract with Top Shelf.  In *Huron Tool*, the Michigan Court of Appeals noted that, "where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold," that misrepresentation does not give rise to a viable tort claim because "the other party is still free to negotiate warranty and other terms to account for possible defects in goods." *Huron Tool*, 532 N.W.2d at 545.  In other words, if a seller of goods makes a representation about the character or quality of the goods to induce a commercial buyer to purchase those goods, the buyer should make that representation a part of the warranties in the agreement, if that representation is important to the buyer.  The buyer cannot resort to a tort claim after the fact to cover for its failure to specify its expectations in the contract. *See Huron Tool*, 532 N.W.2d at 544 ("'There is a danger that tort remedies could simply engulf the contractual remedies and undermine the reliability of commercial transactions.  Once a contract has been made, the parties should be governed by it.'"); *see also Neibarger*, 486 N.W.2d at 615 ("Contract principles . . . are generally

---

[1] Think alleges that it was harmed by the fraudulent inducement because it could have terminated the agreement earlier and "made sales otherwise lost" (Am. Compl. ¶ 91), but that harm is indistinguishable from Top Shelf's failure to pay for the product it received from Think, as required by the Distribution Agreement.

more appropriate for determining claims for consequential damage that the parties have, *or could have*, addressed in their agreement.") (emphasis added).

The same concerns apply here. Top Shelf's alleged misrepresentations did not concern the quality or character of the goods sold in the transaction. Instead, they concerned the nature of Top Shelf's performance under the Distribution Agreement. But just as a commercial buyer of goods is free to negotiate the seller's warranties governing those goods, Think was free to enforce the Distribution Agreement as written or to negotiate new terms that would account for the possibility that Top Shelf would not perform as expected. Indeed, as the allegedly non-breaching party in an existing contractual relationship, Think was particularly well-positioned to negotiate its economic risks. Instead, it apparently accepted Top Shelf's representations at face value and agreed to the new terms suggested by Top Shelf. The economic loss doctrine dictates that this sort of claim is properly resolved under principles of contract law rather than in tort.

## 2. Additionally, Think fails to state a claim for fraudulent inducement

Even if Think's fraudulent inducement claim was not barred by the economic loss doctrine, the claim is subject to dismissal because the allegations do not satisfy the elements of such a claim. To establish fraud in the inducement, a party must show the following:

> "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage."

*Custom Data Sols., Inc. v. Preferred Capital, Inc.*, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006) (quoting *Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003)). "The reliance must also be reasonable." *Mediaform LLC v. Suszko*, No. 290482, 2010 WL 2399363, at *1 (Mich. Ct. App. June 15, 2010).

### (a) Representations about the June 12, 2019 order

Top Shelf allegedly induced Think to exceed the credit limit in the Distribution Agreement by falsely representing that Top Shelf's June 12 order "was for categories of product unaffected by [Mrdeza's] inventory [overstocking] concerns." (Am. Compl. ¶ 35.) Mrdeza apparently "added that his analysis of product demand based on trailing 30-day data justified the Top Shelf" order. (*Id.*)  Think claims that it approved the order, relying upon Mrdeza's "representations and expertise, and knowing that Top Shelf had real time insight into the relevant demand data and that Think itself had received indications of significant demand for Think product through Amazon Bulk Buys[.]"  (*Id.* ¶ 36.)

These allegations do not state a claim because there are no facts from which to reasonably infer that Mrdeza's statements were false when they were made, let alone that Mrdeza knew they were false.  Think refers to a September 2019 letter attached to the complaint, in which Top Shelf stated that

> Think materially contributed to Top Shelf being overstocked by threatening to sell to Amazon in June 2019, if Top Shelf did not place an additional $300,000 order, and by demanding that Top Shelf increase its product pricing despite knowing that such price increases would negatively impact sales.

(9/9/2019 Letter to Think, ECF No. 16-2, PageID.229.)  Contrary to Think's allegations in the body of the complaint, no portion of this statement says anything about Mrdeza's *concerns* at the time of the June 12 order.  That the order contributed to overstocking of product does not mean that Mrdeza was, in fact, concerned that the order would do so.  Furthermore, the letter asserts that Top Shelf's increase in product pricing caused the overstocking, not just the order by itself. Thus, the letter does not suggest that Mrdeza was aware that the June 12 order would itself contribute to overstocking and then falsely suggested otherwise.

11

Furthermore, the facts alleged do not permit an inference that Think's reliance upon Mrdeza's representations was reasonable. A party's reliance is not reasonable where "it had the means to determine that the alleged misrepresentation was not true at its disposal." *Walbridge Aldinger Co. v. Angelo Iafrate Constr. Co.*, No. 308223, 2013 WL 3836228, at *7 (Mich. Ct. App. July 25, 2013); *see also Webb v. First of Mich. Corp.*, 491 N.W.2d. 851, 853 (Mich. Ct. App. 1992) ("[T]here can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant.").

Here, Think alleges that it relied, in part, on its own data from Amazon Bulk Buys suggesting demand for its products. (*See* Am. Compl. ¶ 36.) In addition, the Distribution Agreement required Top Shelf to provide Think with "backup documentation as [Think] may reasonably request" before Think would approve a purchase order. (Distribution Agreement ¶ 31.) It also required Top Shelf to "make all historical sales data available to [Think] upon request." (*Id.* ¶ 17.) Under these provisions, Think could have asked Top Shelf to provide documentation to support its orders. Such a request could have confirmed whether Top Shelf's data on customer demand justified the orders. Think cannot claim that it reasonably relied upon Mrdeza's expressed lack of concern when it had the means to verify the basis for Mrdeza's opinion. *Cf. Walbridge*, 2013 WL 3836228, at *7 (finding no reasonable reliance where the party "had the means to determine that the alleged misrepresentation was not true" because the party's contract provided that, "[u]pon written request by Subcontractor, Contractor will provide subcontractor access to all information in Contractor's possession, if any, regarding the Owner's solvency and ability to perform the terms of Owner's contract with Contractor."). And as discussed in Section III.A.1 above, even if the Distribution Agreement did not expressly permit Think to obtain the information

12

it needed, Think could have required that information as a condition to increasing the credit limit. Thus, for all the foregoing reasons, Think did not reasonably rely on Mrdeza's representations when filling orders over the credit limit in the Distribution Agreement.

### (b) Representations about payment

Think further contends that Top Shelf induced it to extend the payment deadlines in the Distribution Agreement by assuring Think that a particular future date "is the worst case pay date" and by Mrdeza stating, "I believe the LOC will allow for quicker payment once the bank makes the funds available." (Am. Compl. ¶ 41.) Think apparently understood "LOC" to refer to an existing line of credit but Think later learned that Top Shelf had merely applied for financing. (*Id.* ¶ 91.)

The foregoing allegations do not state a claim for fraudulent inducement because the alleged representations are not actionable as fraud. Think characterizes these representations as false claims about Top Shelf's "then-existing financial wherewithal" (*id.*), but the statement about the "worst case pay date" is simply a prediction or promise of future payment. Generally, "[a]n action for fraud must relate to past or existing facts, not future events." *Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. Ct. App. 2005).

Think rightly insists that "an unfulfilled promise to perform in the future is actionable when there is evidence that it was made with a present undisclosed intent not to perform," quoting *Foreman*, 701 N.W.2d at 175. To be actionable, however, the promise must be "'made in bad faith without [the] intention of performance,'" such that "'the promise was but a device to perpetrate a fraud.'" *Id.* at 177-78 (quoting *Hi-Way Motor Corp. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816-17 (Mich. 1976)). Think's complaint does not allege bad faith or an intent not to perform. On the contrary, Think alleges that Top Shelf had applied for "$10MM in debt financing from Amazon that Top Shelf hoped to close before August 1, 2019, which coincides

13

with the original payment due dates under the Distribution Agreement." (Am. Compl. ¶ 55.) Think also alleges that "Top Shelf was waiting on the hope of receiving $10MM in financing from Amazon." (*Id.* ¶ 56.) These allegations undermine Think's argument for the bad-faith exception to the rule about future promises as actionable fraud.

Finally, the Court discerns no misrepresentation in Mrdeza's statement of belief about the line of credit, let alone a misrepresentation reasonably relied upon by Think. Think argues that this statement implied that Top Shelf possessed a line of credit, but even so, the statement also indicated that funds were not available to Top Shelf at that time. It did not indicate when those funds would become available. Think could not have reasonably relied upon this statement to extend the payment deadlines in the Distribution Agreement.

For all the foregoing reasons, therefore, Think does not state a claim for fraudulent inducement.

### B. Liability of Mrdeza

Defendants also seek dismissal of Mrdeza. Defendants contend that Think has not alleged sufficient facts to hold Mrdeza personally liable for Top Shelf's breach of the Distribution Agreement. The Court disagrees.

"Under Michigan law, there is a presumption that the corporate form will be respected." *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007). "Courts will honor this presumption even when a single individual owns and operates the entity." *Green v. Ziegelman*, 873 N.W.2d 794, 803 (Mich. Ct. App. 2015). "Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics*, 475 F.3d at 798. "The propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be intensively

fact-driven." *Id.* "[W]hen considering whether to disregard the separate existence of an artificial entity, a court must first examine the totality of the evidence surrounding the owner's use of an artificial entity and, in particular, the manner in which the entity was employed in the matter at issue." *Green*, 873 N.W.2d at 807.

Think's allegations cover all three elements of a veil-piercing claim and are sufficient to survive Defendants' motion to dismiss.

### 1. Mere Instrumentality

When examining whether a corporation is the "mere instrumentality" of another entity or individual, courts look to these factors:

> (1) whether the corporation is undercapitalized, (2) whether separate books are kept, (3) whether there are separate finances for the corporation, (4) whether the corporation is used for fraud or illegality, (5) whether corporate formalities have been followed, and (6) whether the corporation is a sham.

*Glenn v. TPI Petroleum, Inc.*, 854 N.W.2d 509, 520 (Mich. Ct. App. 2014); *accord Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704-05 (6th Cir. 1988). Michigan courts have also considered the commingling of funds and the extent to which the shareholder controlled the decisions of the entity. *See Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996).

Think alleges that Mrdeza is the majority owner and managing member of Top Shelf. Think also claims that Top Shelf is insufficiently capitalized to pay its creditors, as demonstrated by its failure to pay Think even as it continues to sell its remaining inventory of Think's products. In addition, Think alleges that Top Shelf has not maintained corporate formalities because it did not file its annual statements in 2015, 2016, and 2017. Think also alleges that Mrdeza acted against the interests of Top Shelf by attempting to convince Think to permit the assignment of the Distribution Agreement to another entity under Mrdeza's control, The Mrdeza Group, LLC.

15

Finally, Think alleges that Top Shelf used Mrdeza's personal credit card to pay some of its debt to Think. These allegations are not particularly strong indicators that Top Shelf is a mere instrumentality of Mrdeza, but they are sufficient at the pleading stage to give rise to a plausible claim.

### 2. Fraud or Wrong

"A breach of contract has been held to be the kind of wrong that would justify piercing a corporate veil if the corporate form had been abused." *1st State Title v. LP Recordings LLC*, No. 322964, 2015 WL 7750297, at *5 (Mich. Ct. App. Dec. 1, 2015) (citing *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 758 (Mich. 1947)); *see also Servo Kinetics*, 475 F.3d at 799-800 (6th Cir. 2007) (breach of contract constitutes a fraud or wrong for purposes of veil-piercing liability). Here, Think contends that Mrdeza made decisions on behalf of Top Shelf, including whether to return Think's products or to pay Think for those products, in breach of the Distribution Agreement.

### 3. Unjust Loss

Think's harm as a result of Top Shelf's alleged breach of the Distribution Agreement constitutes an unjust loss. *See Servo Kinetics*, 475 F.3d at 800 (losses from breach of contract are an unjust loss); *1st State Title*, 2015 WL 7750297, at *5 (breach of contract sufficient to pierce the corporate veil).

Top Shelf's opposition to Think's claim relies on *Olympic Forrest Products, Ltd. v. Cooper*, 148 F. App'x 260 (6th Cir. 2005), but that case is inapposite. There, the Court of Appeals noted that "there was no evidence indicating that [the corporate officer] ignored corporate formalities or blurred the distinction between the corporations and himself." *Id.* at 263. In contrast, Think has pleaded some facts suggesting that Mrdeza may have ignored corporate formalities or blurred the distinction between himself and Top Shelf.

The Court of Appeals also found that there was no evidence of fraud or illegal activity by the corporate officer in the *Olympia Forrest Products* case. *Id.* at 263. But it did not consider whether breach of a contract would suffice to satisfy the "fraud or wrong" component of a veil-piercing claim, as Think alleges here. Accordingly, that case does not apply. In short, Think states a viable claim against Mrdeza.

### IV. Conclusion

In summary, the Court will grant the motion to dismiss insofar as it seeks to dismiss the fraudulent inducement claim. The Court will deny the motion in all other respects.

An order will enter that is consistent with this Opinion.


Dated: January 4, 2021                     /s/ Hala Y. Jarbou
                                           HALA Y. JARBOU
                                           UNITED STATES DISTRICT JUDGE